UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF GEORGIA

STATESBORO DIVISION

| | |
|---|---|
| JOHN D. MILLER,<br><br>    Plaintiff,<br><br>v.<br><br>BULLOCH COUNTY, *et al.*,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>) Case No. CV608-005<br>)<br>)<br>)<br>) |

## REPORT AND RECOMMENDATION

### I. INTRODUCTION

On an August night in 2005, arrestee John Miller scraped his bare shoulder against a holding cell wall in the Bulloch County, Georgia jail. He later awoke with a burning and itching sensation on that spot. Doc. 22 at 1 ¶ 2; 29 at 1 ¶ 5. What began as a scrape ended -- over two months and a 60-pound drop in body weight later -- with a staph infection that may have traveled to his leg (doctors are not sure), leading to a total hip replacement. Doc. 22 ¶¶ 3-45; doc. 29 ¶¶ 6-49.

Having suffered much pain and a lost hip, Miller brings this 42

U.S.C. § 1983 action against Bulloch County, its county chairman, its sheriff, and the jail's captain -- all in their official capacities only. Doc. 1 at 7 (complaint); doc. 29 at 1 (caption). Hence, Miller sues just Bulloch County,[1] as confirmed in his brief: "The issue presented is whether there was a failure of *Bulloch County* to properly treat [him], and whether anything could have been done that would have alleviated the massive injuries he suffered." Doc. 30 at 1 (emphasis added).

In that regard, he asserts no personal involvement by any named defendant. Docs. 1 & 30. He agrees that respondeat superior liability cannot support a § 1983 claim. *Ashcroft v. Iqbal*, ___ U.S. ___, 129 S.Ct. 1937, 1948-49 (2009) ("vicarious liability is inapplicable to [both] *Bivens* and § 1983 suits," for in such actions "masters do not answer for the

---

[1] As another court explains,

> suits against a public official in his official capacity equate to suits against the government body itself and therefore will not lie. *See, e.g., Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) ("a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office"); *Karcher v. May*, 484 U.S. 72, 78, 108 S.Ct. 388, 98 L.Ed.2d 327 (1987) ("the real party in interest in an official capacity suit is the entity represented and not the individual office holder"); *Brandon v. Holt*, 469 U.S. 464, 471-72, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985) (a complaint naming a government official in his or her official capacity seeks recovery against the government body itself).

*Curry v. Baca*, 497 F.Supp.2d 1128, 1136 (C.D.Cal. 2007) (footnote omitted); *Dull v. West Manchester Twp. Police Dep't*, 2008 WL 717836 at \* 7 (M.D.Pa. Mar. 18, 2008) (unpublished).

torts of their agents."); *Boyd v. Nichols*, ___ F.Supp.2d ___, 2009 WL 1285958 at * 8 (M.D.Ga. May 05, 2009) ("A county may be held liable under 42 U.S.C. § 1983 only for its own unconstitutional or illegal policies and not for the tortious acts of its employees."). Too, it is his burden to show that the County either intended the § 1983 violation or that its custom or policy caused it. *McDowell v. Brown*, 392 F.3d 1283, 1290 (11th Cir. 2004). Illuminating those points, the County moves, over plaintiff's opposition, for summary judgment. Docs. 21, 28-30. Applying the summary judgment standards set forth in *McDowell*, 392 F.3d at 1289, the Court should grant it.

## II. FACTS

Construing all reasonable inferences in Miller's favor (in fact, the Court summarizes here his summary-judgment, response-brief recitation), the facts are relatively straightforward: Two days after the wall-scrape on August 24, 2005, Miller complained of back pain, but a jail nurse dismissed it as a mere boil. Doc. 30 at 2. When he complained again a week later, the bump had grown to the size of a golf ball. *Id.* The jail's medical staff scheduled him to see Dr. Thadius Riley nearly two weeks later. *Id.* Due to overcrowding, Miller was then transferred

3

to another jail, where its nurse "about started crying" when she saw his back. *Id.* He was then transferred back to the Bulloch Jail and on September 8, 2005, he was taken to a hospital where his wound was treated surgically. *Id.* at 3.

On September 15, 2005, he saw Dr. Riley, who prescribed wound care and nasal medication, but jail guards later failed to properly administer the wound-care treatment. *Id.* at 3. Miller complained of shoulder pain again on September 28 and 30, 2005, and Riley saw him again on the 30th. *Id.* Miller claimed both shoulder and right-thigh pain and that he was unable to walk. *Id.* at 4. X-rays taken on October 12, 2005 revealed no evidence of a break or fracture, and in the meantime Miller's shoulder had healed. *Id.* But his leg pain worsened, so he saw Dr. Riley again on November 15, 2005. *Id.* Riley detected a likely infection and referred him to an orthopedist, if Miller did not feel better. *Id.*

Miller did not feel better, and two days later he sought more medical help, complaining of pain both in writing and orally. *Id.* Despite Dr. Riley's instructions, Miller was not taken to an orthopedist. Instead, he saw Riley again on November 23, 2005. Dr. Riley concluded that

Miller needed to see an orthopedist immediately. *Id.* at 4-5. Yet, the jailers never took him or even scheduled an appointment. *Id.* at 5. By Thanksgiving Day, plaintiff was unable to walk and had lost 60 pounds. *Id.* And on November 30th, he passed out. *Id.* Finally, jailers took him to a hospital where he was diagnosed with staph sepsis in his blood and a staph infection "down deep, near [a preexisting] rod in Mr. Miller's leg." *Id.*

Plaintiff ends his recitation there. The defendants point out, in their evidentially-supported Statement of Undisputed Material Facts, that Miller was (while still hospitalized) formally released from jail custody on December 6, 2005. Doc. 22 at 7 ¶ 43. Dr. Riley, meanwhile, deposes that "there is no way to tell . . . for sure" whether Miller's shoulder infection migrated from his shoulder to his hip. *Id.* ¶ 44. Finally, "[n]o doctor or provider of any kind has expressed an opinion as to the origin or cause of the Plaintiff's *staph* infection." *Id.* ¶ 45.

### III. **ANALYSIS**

#### A. Causation Threshold

In *McDowell*, the plaintiff "argue[d] that DeKalb County's custom of understaffing [its] Sheriff's Office (and [its] jail) delayed the treatment

5

of his [spinal cord compression] condition and thereby violated his rights under the Eighth Amendment." *McDowell*, 392 F.3d at 1289. McDowell traced that county's liability to its failure to properly fund the resources necessary to staff the jail. *Id.* at 1289. But absent a showing that under-resourcing caused *prior* medical deprivations (thus putting that county on notice) and that the county *still* failed to act remedially (thus showing deliberate indifference to that fact), no § 1983 liability could be established. *Id.* at 1291.[2]

---

[2] *McDowell* underscored a liability spectrum. At one end, "a governing body's own intentional acts that violate constitutionally protected rights [can] amount to 'per se' § 1983 liability." 392 F.3d at 1291 So "where the municipal action *itself* violates federal law, or directs an employee to do so[,] issues of fault and causation are straightforward, and present no difficult questions. *Id.* (quotes, cite and alterations omitted).

"At the other end . . . [sits] the plaintiff [who] claims that a municipality's facially valid actions violated his constitutional rights. In such a case, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Id.* (quotes and cite omitted). Congress, after all, "did not intend municipalities to be held liable unless *deliberate* action attributable to the municipality directly caused a deprivation of federal rights." *Id.* (quotes and cite omitted).

Hence, a § 1983 plaintiff like Miller must demonstrate that the lawful action was "taken with deliberate indifference as to its known or obvious consequences." *Id.* (quotes and cite omitted). "Plainly stated, a showing of simple or even heightened negligence is not enough." *Id.* (quotes and cite omitted). In that no § 1983 municipal liability can extend to "inadequate hiring practices," likewise it cannot extend to "inadequate budgeting practices" (which in turn lead to under-staffing and under-resourcing of municipal jails) absent notice "based on previous violations of federally protected rights." *Id.* (quotes and cite omitted).

Where notice is sought to be shown from previous violations, they must be of

6

Similar to *McDowell*, Miller fails to point to an explicit policy or a preexisting pattern of injuries linked to Bulloch County's "under-resourcing" decisions. The bulk of his brief shows that jail medical staff could and should have moved more quickly, and failed to comply with Riley's "orthopedist" directive. Doc. 30 at 2-6, 7-14. Yet, that is irrelevant to his official-capacity level claim, where none of the official-capacity defendants are alleged to have had specific knowledge of Riley's order. Thus, Miller must show that a county-level decision (under-budgeting, etc.) was "highly likely to inflict the *particular* injury" he alleges. *McDowell*, 392 F.3d at 1292 (quotes and cite omitted). That injury must be shown to have been a "plainly obvious consequence" of the county's acts or omissions. *Id.* (quotes and cite omitted). He can prove that by citing to enough prior incidents to put the County on

---

sufficient number to form a pattern so that "a reasonable member of [a municipality's governing] Board would conclude that the [municipality's] budget decisions would lead to the [alleged § 1983-redressable violation]." *Id.* at 1292. "[T]his [requirement] prevents the imposition of liability based upon an isolated incident." *Id.* at 1290; *Gambuzza v. Gillum*, 2009 WL 425954 at * 1 (M.D.Fla. Feb 20, 2009) (unpublished) ("The custom or practice must allegedly occur with frequency and be supported by evidence of numerous incidents of similar conduct."); *cf. Lewis v. City of West Palm Beach, Fla.*, 561 F.3d 1288, 1293 (11th Cir. 2009) (city may be put on notice of need to train and/or supervise in particular area, for purposes of § 1983 alleging failure to provide adequate training, either: (1) if city is aware that pattern of constitutional violations exists, and nevertheless fails to provide adequate training, or (2) if likelihood for constitutional violation is so high that need for training would be obvious).

notice that its custom or policy likely would cause serious medical harm. Yet Miller cites *no* prior incidents, much less an explicit under-resourcing policy. Instead, he relies on only the facts of *his* case:

> A genuine issue of fact exists as to whether the policy in place at Bulloch County Jail was adequate enough to provide Mr. Miller medical care for his condition. As demonstrated by the facts herein the policy in effect at that time was not [adequate]. Bulloch County's policy concerning medical treatment is that inmates who desired medical attention must submit a request for medical service. That request and inmate [sic] is then evaluated by a nurse who visits the jail a few times each week. That nurse then determines whether the inmate should treat with Dr. Riley. Assumingly, inmates with emergencies would be taken to the hospital at that time. This is the extent of the policy.
>
> [The Jail's] medical care system was overly simplistic and inadequate in this case. There is simply no procedure for sending inmates, like Mr. Miller, *to another doctor or specialist*. Dr. Riley opined on two different occasions that Mr. Miller needed to see an orthopedist. However, there is no means in the Jail's policy to accomplish that; the Jail can *only* send inmates to Dr. Riley -- a catch 22. . . . There is no manner in which an inmate, who is critically sick but not "emergency sick" to receive emergency treatment. There is similarly no established procedure for an inmate to see a physician besides Dr. Riley. Bulloch County jailors could only merely direct the sick inmate to the jail nurse, who then made the decision of further care. . . . A reasonable jury could find that, as an established policy, the failure to provide medical care to an obviously ill inmate solely because the Jail's regular doctor was *not* capable of treating the inmate constitutes a deliberate indifference.

Doc. 30 at 12-13 (emphasis added).

Miller thus argues that, as a matter of (*de facto*) policy, if the Jail's

8

doctor refers an inmate to a specialist the Jail will simply not comply (presumably to be spared the expense), so the Millers of the inmate world are thus destined to suffer serious medical consequences (delayed-treatment complications, pain, etc.).[3] Put another way: (a) a no-specialist policy would inevitably lead to a serious medical disaster (which he insists his case to be); (b) the County simply *had* to be on notice of that policy; and therefore (c) such is enough to meet the *McDowell* benchmark (or, at least, it is enough to present this matter for a jury to decide the issue). He therefore wants a jury to decide causation, yet he cites no prior violations of sufficient number so that "a reasonable member of [a municipality's governing] Board would conclude that the

---

[3] True, he does (in passing) complain about the fact that an inmate must pass through a nurse-gatekeeper in order to be seen by the doctor, in this case Dr. Riley. Yet, that is no different than myriad hospital emergency rooms throughout the nation. For that matter, he cites no case holding that the use of a screening nurse violates the Eighth Amendment. Thus, the real complaint here is a Jail "policy" of disregarding a "specialist directive" from the Jail's doctor. This is reinforced later in his brief:

[S]ufficient causation exists between the inadequate policy of medical care at [the Jail] and the lack of medical care Mr. Miller received. The policy did not provide for a means for Mr. Miller to meet with an orthopedist; and accordingly, Mr. Miller did not treat with an orthopedist during the fifteen days that it was requested by Dr. Riley. A reasonable jury could find that this lack of medical care [constitutes] non-treatment, and such non-treatment, as a consequence of inadequate medical policy, to be the proximate cause of Mr. Miller's injuries.

Doc. 30 at 13.

[municipality's] budget decisions would lead to the [alleged § 1983-redressable violation].'" *McDowell*, 392 F.3d at 1292. A custom, after all, "is a practice that is so settled and permanent that it takes on the force of law." *Wayne v. Jarvis*, 197 F.3d 1098, 1105 (11th Cir. 1999) (quotes and cite omitted). That means repetition occurring from repeated incidents. This Miller has failed to show. Nor does he point to an admission (direct evidence) that this was the County's policy.

Absent such a showing, the Court presumes that someone further down the decision-chain (i.e., someone who is *not* a County decision-maker whose decisions would represent County policy) made a bad call here, so at most Miller has shown simple if not gross but non-actionable negligence that he now impermissibly upstreams to the County via respondeat superior. His claim thus fails as a matter of law.[4]

---

[4] Miller places much reliance on *Howard v. City of Columbus*, 521 S.E.2d 51 (Ga. Ct. App. 1999), which is not binding on this Court. Doc. 30 at 7-8. There, a county jail prisoner died of diabetic ketoacidosis at a county hospital -- brought there from a municipal jail only after it was too late to save him. The record showed that

> Howard was a diabetic with hypertension. By policy, the intake screening in the Muscogee County jail was performed by a deputy with no medical training who did not take a medical history for diabetes or hypertension and looked only for observable physical conditions or injuries. Thus, Howard's jail records did not flag his medical condition. After his incarceration on October 1, 1991, lack of proper diet and medication caused Howard's diabetic condition to worsen over time. By April 1992, Howard's diabetic condition had deteriorated to the extent that he appeared visibly sick to a lay person.

## B. Eleventh Amendment Immunity

To the extent that Sheriff Anderson and Captain Harris are said to have administered the jail through their (and not the County's) policies, the question arises here whether they are entitled to Eleventh Amendment immunity from suit in their official capacities. *Manders v.*

---

*Id.* at 59. Despite repeated notice to the jail's nurse, she refused, as a matter of policy, to see him. *Id.* His condition worsened to the point of death, and the record showed that "repeated and prolonged denial of access to a physician for an obviously seriously sick inmate constitute[d] deliberate indifference and reckless conduct." *Id.* at 62 (applying federal § 1983 precedent). As for holding the municipality liable,

> [p]laintiffs provided evidence that, prior to Howard's death from diabetes, the defendants engaged in deliberate indifference through a policy and pattern of practice in not treating diabetics. The fact that ten to thirteen inmates have died from diabetes while in custody between 1980 and 1992 is some evidence of deliberate indifference to providing appropriate medical care and treatment for diabetics.

521 S.E.2d at 64. The court thus specifically identified a series of prior cases that, a jury could conclude, put the municipality on notice and thus supported the conclusion that it deliberately ignored serious medical needs "to save money by limiting direct physician care and hospitalization of seriously ill inmates. . . ." *Id.* Hence, "the policies of Columbus, Muscogee County, a governmental entity, constitute[d] a violation of constitutional rights by providing for potentially inadequate, delayed, or insufficient medical care and treatment and raise a factual question as to the causation of Howard's death. Here, the policy caused the constitutional violation as the 'moving force,' which was executed by its employees." *Id.* at 62-63.

In contrast, Miller points to *no* such prior-incident evidence here, but merely argues that because an apparent "gone-cheap" practice (no specialist-referral) occurred in his case, a jury might infer that it formed part of an ongoing, *Howard*-level practice. *McDowell*, however, demands that Miller point to prior-incident evidence *now* (on summary judgment, and after having had an opportunity to conduct discovery and unearth such evidence).

*Lee*, 338 F.3d 1304, 1328 (11th Cir. 2003) (sheriff can be said to enjoy Eleventh Amendment immunity when he is acting as an arm of the state). Courts have reached different results in this and analogous contexts. *Compare Boyd*, 2009 WL 1285958 at * 7-8 (sheriff who administers county jail through his policies does so as an "arm of the State") *with Youngs v. Johnson*, 2008 WL 4816731 at * 8 (M.D.Ga. Oct. 30, 2008) (unpublished) ("Because the Court finds that the sheriff is an arm of the county in providing medical care in a county jail, [he] is not entitled to Eleventh Amendment immunity"); *see also Kicklighter v. Herrin*, 2007 WL 2248089 at * 8 (S.D.Ga. Jul. 31, 2007) (unpublished) (reminding that "The Eleventh Circuit has not extended *Manders* to all sheriff functions.").

Counties, for that matter, are not arms of the state but arguably could be entitled to Eleventh Amendment immunity if they *act* as an arm of the state. *See N. Ins. Co. of N.Y. v. Chatham County, Ga.*, 547 U.S. 189, 193-95 (2006). But this at most would constitute a narrow exception, *Peery v. Serenity Behavioral Health Sys.*, 2009 WL 1228446 at *6 (S.D.Ga. May 4, 2009) (unpublished) (an entity can act as an arm of the state if it is doing something more than exercising a "slice" of state

12

power), and such immunity has not been argued here. Given the result reached above, these Eleventh Amendment issues need not be resolved.

**C. State Law Claims**

Miller's first state law claim rehashes his Eighth Amendment claims under "Article 1, Section 1, Paragraph XVII of the Constitution of the State of Georgia," doc. 1 at 16 ¶ 14 ("Count I"), and his second sounds in simple negligence, apparently under Georgia's Tort Claim Act, O.C.G.A. § 50-21-21. *Id.* at 17 ¶¶ 16-18. "Georgia courts have not yet decided whether [Ga. Const. Art. I, § 1, ¶ XVII] provides more protection to prisoners than federal constitutional standards," *Boyd*, 2009 WL 1285958 at *11, and state courts are best suited to make that call. Since Miller's state law claims turn on state constitutional and tort law, the Court should exercise its discretion to dismiss them. *See Jordan v. Mosley*, 2007 WL 3102165 (S.D.Ga. Oct. 22, 2007) (unpublished).[5]

---

[5] As explained there,

> the law tilts the Court against retaining jurisdiction. *Mergens v. Dreyfoos*, 166 F.3d 1114, 1119 (11th Cir.1999) (in its discretion the district court may dismiss State law claims after dismissing federal claims; "[m]ore specifically . . . if the federal claims are dismissed prior to trial, [*United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966)] strongly encourages or even requires dismissal of state claims") (quotes and cite omitted); *accord Granite State Outdoor Advertising, Inc. v. Cobb County, GA*, 193 Fed.Appx. 900, 907 (11th Cir.2006); *Van Meter v. City of Lanett, Ala.*, --- F.Supp.2d ----, 2007 WL 2409918 at * 5 (M.D.Ala.8/24/07).

13

Accordingly, the Court should **GRANT** the defendants' motion for summary judgment, doc. 21, **DISMISS WITH PREJUDICE** plaintiff's federal claims, then **DISMISS WITHOUT PREJUDICE** his state-law claims.

**SO REPORTED AND RECOMMENDED** this __16th__ day of June, 2009.

/s/ **G.R. SMITH**
**UNITED STATES MAGISTRATE JUDGE**
**SOUTHERN DISTRICT OF GEORGIA**

---

2007 WL 3102165 at * 2; see also *Draper v. Reynolds*, 369 F.3d 1270 (11th Cir. 2004) (federal courts resolved § 1983 claims, then remanded state law claims to the state court, which resolved them in *Draper v. Reynolds*, 629 S.E.2d 476 (Ga. Ct. App. 2006)).